UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
NANCY O'CONNOR,

            Plaintiff,

        - against -

SMITH & LAQUERCIA, LLP, & THOMAS
LAQUERCIA,
            Defendants.
------------------------------------------------------------- x

**MEMORANDUM DECISION AND ORDER**

08-CV-4559 (ENV) (MDG)

**VITALIANO, D.J.**

Plaintiff Nancy O'Connor brought this employment rights action against her former employer, Smith & Laquercia, LLP ("S&L"), naming one of its two principal partners, Thomas Laquercia ("Laquercia") as a co-defendant. O'Connor seeks to recover lost wages, liquidated and punitive damages, costs and attorneys' fees pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").[1] Specifically, she asserts that the termination of her employment at S&L was the product of unlawful age and disability discrimination. Defendants counter that O'Connor was fired because she failed to maintain communication with the firm during a prolonged absence from work. A counterclaim for fraud has been interposed, alleging that O'Connor misrepresented her medical condition and intention to return to work to induce the firm to pay her full salary during her absence. O'Connor contends that this counterclaim was brought solely as improper retaliation for her initial lawsuit.

---

[1] Plaintiff's amended complaint also included causes of action under Title VII, but these claims were not mentioned at trial or in the parties' joint pretrial order (Dkt # 27) and post-trial submissions (Dkt. # 30-31, 33-34). The Court considers these claims to have been abandoned.

1

Trial before the Court sitting without a jury began on March 29, 2010, and concluded the following day. Post-trial briefs were submitted by both sides. Having considered the testimony, the exhibits received in evidence, and the arguments of counsel, this Memorandum Decision and Order, pursuant to Federal Rule of Civil Procedure 52, constitutes the Court's findings of fact and conclusions of law.

## **FINDINGS OF FACT**

Plaintiff began working at S&L, a 30 employee law firm located in downtown Manhattan, in 1990. In 2006, she was 59 years old and making an annual salary of $65,000 as a word processing supervisor. (Tr. at 8-9.)[2] Over the course of 16 years, O'Connor and Laquercia, the partner responsible for personnel decisions at the firm (Tr. at 206, 261-62), formed a strong working relationship; Laquercia considered O'Connor "critical for our office" and "like family." (Tr. at 269-70.) When O'Connor had medical concerns, Laquercia sought to accommodate her needs so she could regain her health and continue working. For example, in 2000-01, when O'Connor was suffering from foot and back problems, Laquercia offered to pay for a car service to take her to and from work, and ultimately covered the cost of a parking garage when O'Connor's friend and co-worker Renata Magnoni agreed to provide transportation. (Tr. at 133-34, 264-65.)

O'Connor's last day in the S&L office was November 20, 2006. After taking two sick days and the Thanksgiving holiday weekend, on November 27, O'Connor left Laquercia a voicemail explaining that she needed to take an indeterminate amount of time off to seek medical attention for her back pain. (Tr. at 43.) As O'Connor testified, the back pain did not prevent her

---

[2] References to "Tr." denote the trial transcript.

from working, but her "lifestyle had just deteriorated to coming home, taking Tylenol PM and going to bed and going back to work the next day." (Tr. at 10-11.) Laquercia arranged for O'Connor to see his orthopedist on November 29, who took x-rays and concluded that there might be a mass leaning against plaintiff's spine. (Tr. at 11.) A subsequent CT scan revealed a tumor, and O'Connor scheduled surgery for January 19, 2007, learning at some point in December that there would be a six to eight-week recovery period. (Tr. at 50-51.)

Communications between O'Connor and the firm prior to the surgery were infrequent. Both Laquercia and S&L's other principal partner, Edwin Smith, testified that they only learned of the surgery shortly before it happened. (Tr. at 207-08, 271.) There were no discussions regarding the length of O'Connor's absence or her salary, but she continued to be paid in full for a few months, as both Smith and Laquercia believed that it was the proper thing to do for their long-time employee. (Tr. at 207, 270.) O'Connor testified that she did not request or expect salary, and "was totally surprised and happy" when she realized that she was still getting paid; nonetheless, she testified, she was "too consumed with [her] illness to be really that concerned with money issues." (Tr. at 51.) Moreover, O'Connor testified repeatedly that she assumed that she would return to her position as soon as she was "better." (Tr. at 51, 64, 114).

The testimony at trial also revealed, though, that O'Connor was uncommunicative with S&L *following* her surgery. At the end of February 2007, she said she fell into an "overwhelming" depression that "got worse and worse" over the ensuing month, and caused her to "not care" about money, getting disability coverage, calling S&L, or much anything else.[3] (Tr.

---

[3] She did, however, have the wherewithal to meet with her accountant to do her taxes. (Tr. at 69-70.)

3

at 11-12, 69, 86.) She explained that "when I became depressed, I didn't . . . contact [S&L] as regularly. I really didn't want to tell anybody I was depressed . . . ." (Tr. at 20.) She considered her ability to communicate "severely impaired" (Tr. at 99), and acknowledged that she "should have been calling them like I had been in the beginning on a rather frequent basis. As I said, I was depressed and couldn't do it." (Tr. at 108-09.) Further, she admitted that she never requested any form of accommodation that would permit a return to work (Tr. at 99), and when Laquercia sent a laptop computer to O'Connor's home in early February unsolicited, with the apparent (but not explicitly stated) intention for her to start easing her way back by working remotely (Tr. at 272-73), she found it inappropriate and returned the laptop by mail without reaching out to S&L. (Tr. at 113.)

Aside from citing her own malaise and lack of communication, however, O'Connor was unable at trial to discuss with specificity her actions from February to April 2007. She attributed her inability to recall many facts, such as her communications with others and the improvement of her physical health, to the depression itself: "When I became depressed, time became out of focus." (Tr. at 55.) She was even unclear about her medical and psychological treatment, testifying that she was not sure whether she received the anti-depressant drug Lexapro as a prescription or just as a free sample from her general practitioner. (Tr. at 320.) O'Connor's testimony evolved and changed over the course of her direct and cross-examinations, and her recollections were often inconsistent with her prior statements at deposition. In short, although the Court does not doubt that O'Connor was in a troubled state of mind in 2007,[4] it finds her

---

[4] The Court expresses no view on whether O'Connor was *clinically* depressed at that time, given the lack of expert testimony, but notes that she never visited with a psychiatrist or psychologist, and only

4

testimony as to her conduct during this period to be not credible.

Based on these findings, the Court further determines that O'Connor did not keep S&L informed of her condition or of any intention to return to work. O'Connor's only post-surgery communication with S&L, aside from social calls with Magnoni (Tr. at 93), occurred when she was phoned by Susan Saxe, S&L's bookkeeper, whose duties included managing S&L's employee benefits programs. Saxe was attempting in her contacts to get O'Connor to follow through on filling out disability insurance forms so S&L could continue to receive some reimbursement. Soon, she began to express to Laquercia and Smith her frustration with O'Connor's apparent failure to complete the forms and her lack of communication. (Tr. at 223, 237.) When Saxe learned that the short term insurance carrier was going to discontinue coverage, on March 19, 2007, she sent a memorandum to O'Connor explaining that it was her "responsibility" to complete disability forms and follow up with her doctors to ensure that reimbursement continued. (Defs.' Ex. 13.)

Throughout this period, Laquercia was growing irritated at the lack of reimbursement and O'Connor's failure to communicate, and he began doubting that O'Connor intended to return to work. (Tr. at 277, 283). Magnoni testified that in January 2007, Saxe told her that she (Saxe) overheard Laquercia say that O'Connor was "too sick, too old, and too fat" to work.[5] (Tr. at 176). Similarly, Doreena Davidson, one of O'Connor's colleagues at S&L, testified that she

---

received some informal "treatment" from her general practitioner, often "outside the formal reception area so I wouldn't have to pay the $140 fee." (Tr. at 63, 320.)

[5] Defendants challenge Magnoni's testimony as biased because she also had sued defendants for discrimination, and O'Connor testified on her behalf in that action. (Tr. at 181-82.) Despite this fact, the Court finds Magnoni's testimony on this score to be credible.

5

overheard Laquercia tell Smith a similar comment in April. (Tr. at 165.) Unsurprisingly, Smith testified that he never heard Laquercia make any comment of that nature. (Tr. at 215.)

On March 30, Saxe called O'Connor and explained that that S&L was not going to pay her any longer, and that it was imperative that she get in her disability papers. (Tr. at 238-39.) Based on this call, Saxe recognized that O'Connor was feeling down or depressed, but she had no information that it was particularly severe or merited taking anti-depressants.[6] (Tr. at 239-40.) On April 20, 2007, Laquercia sent O'Connor a letter explaining that S&L was terminating her employment, stating that "we have had no clue as to your medical condition or even if you ever intended to return to work" and that he could not "recall how long it has been since we spoke." (Pl.'s Ex. 9.) Laquercia further noted that O'Connor never responded to letters regarding disability claims and that he could "only assume that you do not intend to return" to the firm. (Id.)

Four days later, O'Connor's sister forwarded an email from O'Connor to Laquercia and Smith. The email claims that plaintiff "originally emailed" them on April 18, but that they "may not have received the original email" (Pl.'s Ex. 8). O'Connor apologized for not calling, explaining that she was in physical pain and had "been in a state of deep depression," but was "taking anti-depressants and hopefully I will feel better soon." She further wrote that she was "sorry I haven't kept you posted after you were both so kind and generous" and that she wanted to return to work on April 30. (Id.) Laquercia responded by email two days later, explaining

---

[6] Aside from the general credibility issues discussed above, O'Connor's testimony that she told Saxe that she was not returning to work due to severe depression is particularly incredible in light of her inability to recall other calls or even estimate the number of times that she spoke with Saxe. (Tr. at 58, 89.)

6

that the email was "too little too late," and pointing to "open" health issues: "There is nothing to indicate that Nancy is actually able to return to work, or whether her medical condition has improved sufficiently so that she can perform the duties of her job. Moreover, the email actually implies that she cannot stand for any length of time and we assume that she cannot work." Laquercia explained that due to her "failure to report to us on her health while accepting her full salary without any indemnification for Long Term Disability, we assumed that she was not coming back to work for ou[r] firm." (Id.) On April 30, O'Connor left Laquercia a voicemail stating that she received his letter and requesting that he "rethink this position" since "after a major surgery I went into a major depression and I was not able to make a phone call." (Defs.' Ex. 28)

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over ADEA claims pursuant to 28 U.S.C. § 1331. The claims arising under NYCHRL are so obviously related to the ADEA claims that they form part of the same case or controversy, bringing them within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Venue is unquestioned and appropriate.

### I. Age Discrimination

Plaintiff claims that her termination violated the ADEA and NYCHRL, both of which prohibit age discrimination in employment decisions. The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer . . . because of the actual or perceived age, race, creed, color, national origin, gender, disability . . . of any person, to . . . discharge from

7

employment such person . . . ." N.Y.C. Admin. Code § 8-107(1)(a).

As a general matter, "[a]ge discrimination claims brought pursuant to . . . NYCHRL are analyzed under the ADEA framework." Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) (citing Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 n.3 (2d Cir. 2007)); Weiss v. JPMorgan Chase & Co., 06-CV-4402, 2010 U.S. Dist. LEXIS 2505, at *5 (S.D.N.Y. Jan. 13, 2010). There is, however, potential for significant divergence. In Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009), the Supreme Court recently clarified that the burden of persuasion for ADEA claims is more onerous than for other civil rights claims. Whereas Title VII permits plaintiffs to establish discrimination by showing that their inclusion in a protected class "was simply a motivating factor" in an employer's adverse employment action, id. at 2349, "under the plain language of the ADEA, an employee bringing a disparate treatment claim must prove by a preponderance of the evidence that age was the 'but-for' cause behind the employer's adverse decision, and not merely one of the motivating factors." Hrisinko v. N.Y.C. Dep't of Educ., 369 Fed. Appx. 232, 234 (2d Cir. 2010) (citing Gross, 129 S. Ct. at 2350). It is less clear whether the logic of Gross applies to analogous local laws, but one court directly confronted the issue recently and concluded that an age discrimination plaintiff under NYCHRL "need only prove by a preponderance of the evidence that his age was 'a motivating factor'" in a defendant's decision to terminate employment.[7] Weiss, 2010 U.S. Dist. LEXIS 2505, at *12.

In the case tried to the Court, it is unnecessary to determine whether the NYCHRL analysis tracks the restrictive ADEA one as a matter of law, because O'Connor would not

---

[7] As of this writing, there is no definitive state court decision interpreting NYCHRL's similar language in light of Gross.

8

succeed even under the less burdensome "mixed motive" standard. Simply put, the Court finds as a matter of fact that her age was not a motivating factor – much less the "but for" cause – of defendants' decision to terminate her employment.

The age discrimination claims are premised entirely on Laquercia's comments to Smith – overheard by Magnoni and Davidson – that O'Connor was "too old" to work. Significantly, she presents no other evidence indicating that Laquercia or anyone else at S&L harbored any age-based animus or stereotypes against older employees like O'Connor, or that they made any employment decisions based on such attitudes. In fact, the evidence is most compellingly to the contrary. The record reveals that Laquercia considered O'Connor an almost indispensible employee throughout her 16 year tenure, including during the period just prior to termination. Termination came not because of age but out of frustration with her lack of communication during a prolonged five month absence; S&L even continued to pay her full salary for a significant period of time as a gesture of good will. Given this context, notwithstanding their proximity to O'Connor's discharge, Laquercia's comments are best understood as "stray remarks," which "even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998); see Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007) (noting that "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be"); Bookman v. Lynch, 02-CV-1108, 2009 U.S. Dist. LEXIS 40766, at *31-*32 (S.D.N.Y. May 14, 2009) (explaining that a "stray comment may bear a more ominous significance when considered within the totality of the evidence") (internal quotation marks omitted).

While in no way approving of Laquercia's obnoxious outbursts, the Court does not find that his words reflected any actual age-based animus on his part. Defendants have amply supported – and O'Connor has effectively admitted – that there were legitimate, nondiscriminatory reasons for her termination, namely her failure to keep the firm updated as to her medical status, apprise defendants regarding her intention to return to work, and file forms necessary to secure long term disability benefits. Even given Laquercia's outbursts, the Court finds that O'Connor's age played no role whatsoever in defendants' employment decision, and, therefore, finds in favor of defendants on plaintiff's age discrimination claims under both ADEA and NYCHRL.[8]

## II. Disability Discrimination

O'Connor also brings municipal claims pursuant to NYCHRL that her termination was based on perceived disability and that defendants failed to provide her with reasonable accommodation. N.Y.C. Admin. Code § 8-107(1)(a). "In general, disability claims under . . .

---

[8] The parties' post-trial briefs address the applicability of the familiar McDonnell Douglas burden-shifting framework applicable to Title VII and other such claims on summary judgment. Although the Second Circuit has concluded that, post-Gross, courts still "remain bound" by McDonnell Douglas in ADEA cases, Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010), the Court here is not deciding a summary judgment motion. Pointedly, there is little utility to reciting that rubric's various shifts in the burdens of production after a full trial has taken place. The burden is on plaintiff to prove her claims by a preponderance of the evidence. Plaintiff's argument that she need not demonstrate a "prima facie" case as set forth by McDonnell Douglas because Laquercia's "too old" comments constitute "direct," rather than circumstantial, evidence of discrimination," is therefore irrelevant. Cf. Bookman, 2009 U.S. Dist. LEXIS 40766, at *31 ("Regardless of whether the Price Waterhouse or McDonnell Douglas framework is applied, the ultimate issue is: 'Whether the plaintiff has presented evidence from which a rational finder of fact could conclude that the defendant discriminated against [him] illegally.'") (quoting Jalal v. Columbia Univ., 4 F. Supp. 2d 224, 234 (S.D.N.Y. 1998)). The Court, as the finder of fact in this case, concludes that O'Connor has failed to carry her burden because her age did not motivate defendants' decision to terminate her employment in any way. Other than Laquercia's stray remarks, she offers no proof of age discrimination at all.

NYCHRL are subject to the same analytical framework as claims under the [federal Americans with Disabilities Act ("ADA")]."[9] Bresloff-Hernandez v. Horn, 05-CV-384, 2007 U.S. Dist. LEXIS 71257, at *12 n.4 (S.D.N.Y. Sept. 25, 2007).

To succeed on her claim of unlawful disability-based termination, O'Connor must prove by a preponderance of the evidence that: (1) defendants are subject to NYCHRL; (2) she was disabled or perceived to be disabled within the meaning of NYCHRL; (3) she was qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she was terminated because of her disability or perceived disability. Kendall v. Fisse, 149 Fed. Appx. 19, 21 (2d Cir. 2005).

Applying the analytical framework, the Court finds that O'Connor has failed to demonstrate that disability was a motivating factor in defendants' decision to terminate her employment. Defendants knew very little as to the specifics of plaintiff's condition post-surgery, particularly with respect to her psychological well-being. Indeed, there was no reason for defendants to know of it at the time, since O'Connor did little to provide them with an update on her status. Although O'Connor points to Laquercia's comments to third parties that she was "too sick" to work, the Court is not persuaded that these stray remarks reflect invidious discriminatory intent. On the contrary, the trial testimony made clear that O'Connor was considered a highly valued employee by Laquercia and S&L, who went out of their way to get O'Connor appropriate

---

[9]  There are, however, at least two differences between ADA and NYCHRL. First, the standards for what constitute a "disability" are broader under NYCHRL. See Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001); Dellavolpe v. City of New York, 673 F. Supp. 2d 111, 120 (E.D.N.Y. 2009). Second, as discussed infra, the municipal law employs a "more liberal standard" in construing "reasonable accommodation" claims. Julius v. Dep't of Human Res. Admin., 08-CV-3091, 2010 U.S. Dist. LEXIS 33259, at *12-*13 (S.D.N.Y. Mar. 24, 2010) . Plaintiff has made no claim under ADA.

treatment and speed her return to work. To that end, Laquercia arranged for her to see his own doctor and get paid full salary for four months of sick leave. Critically, Laquercia, based on the information known to him, believed that O'Connor *could* work with reasonable accommodation, which is why he sent a laptop computer to O'Connor's home. These are not the actions of someone who is seeking to terminate an employee because he perceived her to be disabled and/or unable to work with reasonable accommodation. In fact, it is not clear that Laquercia considered her disabled at all (beyond simple post-surgical recuperation period) until he received her email *after* she had been terminated, which he believed "implie[d] that she cannot stand for any length of time." (Pl.'s Ex. 8.) But, that perception was no different from the perception defendants had of O'Connor's physical disability in February, which they sought to accommodate. Moreover, there was no hint that Laquercia perceived O'Connor psychologically disabled at any relevant time.

O'Connor's claim that defendants violated NYCHRL in not accommodating her medical and psychological conditions "by failing to excuse her absence from work from November 2006 through April of 2007", thus, fares no better. (Pl. Post-Trial Br. at 4.) NYCHRL requires employers to "make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15). To make a claim of failure to accommodate under NYCHRL, O'Connor must prove that: (1) she has a disability as defined by the statute; (2) defendants knew or should have known about the disability; (3) with reasonable accommodation she could perform the essential functions of her job; and (4) defendants failed to make such accommodation. Missick v. City of New York, 07-CV-1494, 2010 U.S. Dist. LEXIS

48292, at *40 (E.D.N.Y. Mar. 22, 2010); Roberts v. AIG Global Inv. Corp., 06-CV-5966, 2008 U.S. Dist. LEXIS 76891, at *22 (S.D.N.Y. Sept. 30, 2008). Although "[g]enerally it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed . . . an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled." Roberts, 2008 U.S. Dist. LEXIS 76891, at *23 (internal quotation marks and citations omitted).

Here, other than post-surgical recuperation, the evidence at trial does not support the conclusion that defendants were aware of or perceived any disability under the ordinance due to plaintiff's lack of communication; they were informed that physical recovery from the surgery would take six to eight weeks, and they had no specific information regarding any clinical depression from which O'Connor may have been suffering. Certainly this lack of communication is at odds with any argument by plaintiff that her disability should have been known or "obvious" to defendants, particularly in light of the fact that O'Connor never requested *any* form of assistance or accommodation over the course of five months.[10] Notwithstanding, defendants made an effort to accommodate her in various ways recounted above that even O'Connor conceded were "generous." The sum of it is, the Court finds, that defendants did attempt to provide O'Connor with reasonable accommodation for the "disability" they perceived

---

[10] Even at trial O'Connor failed to prove by a preponderance that she was disabled psychologically. All that she established was that she felt "depressed" and that in pursuit of medical help for her back, she had only an informal, unpaid chat or two with a doctor about her "depression." Bizarrely, she also relied on some gratuitous advice given her by her accountant to resume taking anti-depressants (Tr. at 59) at a time she claimed at trial she was psychologically unable to perform any work. None of this was known to defendants prior to termination.

her to have, and provided her full pay, even though they were not obligated by statute, ordinance or contract to pay her salary.

Moreover, plaintiff's claim also fails because, assuming she was not capable of performing the essential functions of her job, she was also not capable of performing them even with reasonable accommodation.[11] O'Connor testified repeatedly that, owing to her essentially self-diagnosed psychological condition, her communication with defendants lapsed and that she stopped caring about work or money. She not only had no timetable for returning to work – she had no interest in it either. She now argues that under NYCHRL, a five month leave of absence can constitute a "reasonable" accommodation, see Phillips, 66 A.D.3d at 182, 884 N.Y.S.2d at 378, but her factual premise that she was ready or willing to return to work at the end of April 2007 is not only self-serving, but irrelevant. At no point were defendants asked to accommodate O'Connor by granting her a five month leave of absence for recovery; nor is there any proof that, given the nature of her untreated psychological issues, that such an accommodation would be successful. Rather, O'Connor only informed defendants of an interest to return to work in an email that defendants received *after* she was terminated. In the meantime, defendants were under no obligation to "accommodate" O'Connor by leaving her position open indefinitely without any communication (direct or indirect) from her indicating her intended return date or

---

[11] NYCHRL states that "[i]n any case where the need for reasonable accommodation is placed in issue, it shall be an *affirmative defense* that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job . . .", N.Y.C. Admin. Code § 8-107(15)(b) (emphasis added), and at least one court has found that the burden rests on a defendant to prove that accommodation would not alleviate a plaintiff's inability to work. See Phillips v. City of New York, 66 A.D.3d 170, 182, 884 N.Y.S.2d 369, 378 (1st Dep't 2009). Regardless of whether the burden of establishing ability to work rests on plaintiff in the prima facie case or defendants as an affirmative defense, the Court reaches the same determination, for the call is not close.

general medical progress. See Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 186 (2d Cir. 2006) ("The duty to make reasonable accommodations does not . . . require an employer to hold an injured employee's position open indefinitely . . . .") (quoting Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000)); Vosburg v. Am. Nat'l Red Cross, 08-CV-653, 2009 U.S. Dist. LEXIS 99826, at *25 (N.D.N.Y. Oct. 27, 2009) (noting that "employers are not required to provide employees with indefinite periods of leave"); McNamara v. Tourneau, Inc., 496 F. Supp. 2d 366, 376 (S.D.N.Y. 2007), aff'd, 326 Fed. Appx. 68 (2d Cir. 2009) (explaining that "[i]ndefinite leave is not a reasonable accommodation") (quoting Porter v. N.Y. Univ. Sch. of Law, 00-CV-4693, 2003 U.S. Dist. LEXIS 14674, at *29 (S.D.N.Y. Aug. 25, 2003)).

Whatever the ultimate cause of her nonfeasance, O'Connor admitted that she failed to remain in contact with S&L and did not inform them when she had hoped to return. It was for these reasons alone, and not disability crimination, that she was terminated by her long-time employer. Succinctly, O'Connor's termination did not violate any federal or local law barring employment discrimination based on an employee's actual or perceived disability.

## III. Retaliation Claim & Fraud Counterclaim

Following its receipt of the complaint in this action, defendants brought a counterclaim for common law fraud, alleging that plaintiff misrepresented her medical condition and the status of her disability insurance applications so that she could continue receiving salary without performing work.[12] (Defs.' Answer & Counterclaims, Dkt. #5, ¶¶ 35-48.) In her amended complaint, O'Connor claimed that the counterclaim was "baseless and frivolous," and was

---

[12] Defendants also brought a counterclaim for unjust enrichment, but it is not in the parties' joint pretrial order. It is deemed abandoned and is dismissed with prejudice on that basis.

asserted purely as retaliation for the initial lawsuit. (Pl.'s Am. Compl., Dkt. #9, at 22.)

As an initial matter, the Court finds in favor of plaintiff on defendants' counterclaim for fraud. "The elements of fraud under New York law are: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (internal quotation marks omitted); see State Farm Mut. Auto Ins. Co. v. Grafman, 655 F. Supp. 2d 212, 220 (E.D.N.Y. 2009). Defendants argue that O'Connor's representations to Saxe – and only to Saxe – that she intended to return to work and was applying for benefits caused them to "detrimentally rel[y] . . . by continuing to pay [her] salary in expectation of at least partial refund from the disability carriers" for two pay periods. (Defs.' Br. at 19.) But defendants have failed to prove that O'Connor actually made any misrepresentations. The best they can muster is that "Ms. Saxe credibly testified that she *felt* that Plaintiff misrepresented her intentions and actions." (Id.; emphasis added). Defendants' claim that O'Connor intended to induce them into continuing to pay her salary is similarly without support, since it is undisputed that O'Connor never requested salary, and defendants continued paying her because they felt it fair, not because that payment was contingent on their receipt of disability benefits. That defendants assumed that O'Connor would eventually be returning to work does not mean that they were defrauded by her when she did not.

At the same time, however, the Court also concludes that the fraud counterclaim did not constitute unlawful retaliation under NYCHRL. N.Y.C. Admin. Code § 8-107(7) ("It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter

applies to retaliate . . . because such person has . . . commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter . . . ."). "[A]n employer's lawsuit filed with a retaliatory motive rather than in good faith may constitute an adverse action and provide a basis for a retaliation claim." Eng-Hatcher v. Sprint Nextel Corp., 07-CV-7350, 2008 U.S. Dist. LEXIS 92559, at *12 (S.D.N.Y. Oct. 31, 2008) (internal quotation marks omitted); Fei v. WestLB AG, 07-CV-8785, 2008 U.S. Dist. LEXIS 16338, at *7 (S.D.N.Y. Mar. 5, 2008) ("Lawsuits in response to a former employee's attempt to vindicate his rights can constitute retaliation."). Here, however, in light of O'Connor's nonfeasance throughout the duration of her absence, defendants believed at the time of pleading that she was lying about her medical condition and was intentionally stalling on disability applications in order to continue receiving salary without returning to work or providing the disability carrier proof of her disability.

As Laquercia implies in deposition testimony admitted into evidence (Laquercia Dep. at 58:2-58:7), defendants would likely not have sued O'Connor had she not brought the original lawsuit against them. But, O'Connor did commence an action and defendants did have a potential claim, which, while perhaps not strong enough to justify the costs of an independent lawsuit, could be practically justified as a counterclaim in the context of this suit. Although defendants were unable to adequately support their allegations at trial, plaintiff has not proven that their assertion of this compulsory counterclaim constituted a bad faith action brought purely to retaliate against O'Connor or that such a counterclaim interwoven in the very facts of plaintiff's claim might "deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7). Defendants thought that they had been taken by a confidante who had falsified

her health status. The flimsiness of plaintiff's proof of disability at trial makes defendants' view that O'Connor's conduct was fraudulent most understandable, and supplies a good faith, nonretaliatory subtext. The retaliation claim is dismissed.

## CONCLUSION

The Court has determined after trial that: (1) plaintiff Nancy O'Connor is not entitled to recover against defendants Smith & Laquercia, LLP or Thomas Laquercia for her claims of discrimination and retaliation under ADEA or NYCHRL, and (2) defendants are not entitled to recover against plaintiff on their counterclaim for fraud. All other claims are dismissed as abandoned.

The Clerk of the Court is directed to enter judgment in accordance with this Memorandum Decision and Order, and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
September 8, 2010

_____
ERIC N. VITALIANO
United States District Judge